J-S39001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN LEROY WAGNER | : | |
| | : | |
| Appellant | : | No. 1397 MDA 2021 |

Appeal from the Judgment of Sentence Entered August 3, 2021
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s): CP-21-CR-0000502-2018

BEFORE: PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.: **FILED: MARCH 17, 2023**

Brian Leroy Wagner appeals from the judgment of sentence entered after the trial court convicted him of Criminal Homicide - Murder of the Third Degree, Aggravated Assault, and Endangering the Welfare of Children – Parent or Guardian. The charges arose from allegations that, on July 6, 2017, Wagner violently shook or struck the head of his four-month-old son, Finnick Wagner ("Finnick"), who was brought to the hospital unresponsive and later died. The key dispute at trial pitted the expert testimony presented by the Commonwealth, which argued the child died from physical injuries to the head and spine, against the expert testimony presented by Wagner's defense, which argued that the child died from sepsis arising from an infection and a blood clotting disorder.

For purposes of this appeal, the following facts are undisputed. Finnick was suffering from a fever when his mother went to work on July 6, 2017, leaving him in the care of his father, Wagner. Later that day, Wagner called Finnick's mother, quickly telling her to get home immediately before calling 911 to report that Finnick was not breathing. Under the direction of the 911 operator, Wagner began CPR on Finnick. Finnick ultimately died at the local hospital. Wayne Ross, M.D., conducted an autopsy and concluded that Finnick died as the result of violent shaking or blows to the head. The Commonwealth charged Wagner with multiple crimes related to Finnick's death. A jury ultimately convicted Wagner of third degree murder, aggravated assault, and endangering the welfare of Finnick.

Wagner raises several claims on appeal: the evidence was not sufficient for the conviction of third-degree murder and aggravated assault; the verdict was against the weight of the evidence; and the trial court erred by permitting the Commonwealth to introduce improper expert testimony in rebuttal, an inflammatory autopsy photo, and use a previously unpublished expert report in their closing argument.  Lastly, Wagner asserts that the trial court abused its discretion in sentencing him to an aggregated term of twenty to forty years in a state correctional facility. We disagree and therefore affirm.[1]

---

[1] The original memorandum decision in this appeal was withdrawn with the intent to publish. However, upon further consideration, this new memorandum decision replaces the original memorandum.

First, Wagner argues that there was not sufficient evidence to support the convictions of third-degree murder and aggravated assault. In reviewing the sufficiency of the evidence, "[w]e must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, …enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt." ***Commonwealth v. Tarrach***, 42 A.3d 342, 345 (Pa.Super. 2012)(citation omitted). "The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." ***Id.*** (citation omitted). We, as an appellate court, are not to independently weigh the evidence or substitute our judgment for that of the jury as fact-finder. ***See id.*** The Commonwealth's burden can be satisfied entirely by circumstantial evidence. ***See id.*** Finally, it was for the jury to resolve any doubts about Wagner's guilt, so long as the evidence was not so weak or inconclusive that no inference can reasonably be drawn from the combined circumstances. ***See id.***

A conviction for murder of the third-degree requires sufficient evidence that an individual was killed by another unintentionally, without premeditation, and maliciously. ***See Commonwealth v. Young***, 431 A.2d 230, 232 (Pa. 1981). To establish malice, the Commonwealth must prove that the perpetrator acted with a "hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular

- 3 -

person may not be intended to be injured." ***Commonwealth v. Fisher***, 80 A.3d 1186, 1191 (Pa. 2013) (citation omitted).

"A person is guilty of aggravated assault if he … attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to value of human life." 18 Pa.C.S.A. § 2702(a)(1). Where, as is undisputed here, the victim suffers serious bodily injury, the Commonwealth need not prove specific intent, but need only prove that the defendant "acted recklessly under circumstances manifesting extreme indifference to value of human life." ***Commonwealth v. Nichols***, 692 A.2d 181, 185 (Pa. Super. 1997) (citation omitted). A person acts recklessly with respect to serious bodily injury when they consciously disregard a substantial and unjustifiable risk that serious bodily injury will result from their conduct. ***See id.*** This risk must be of such a nature that the conduct and the circumstances involve a gross deviation from the standard of conduct that a reasonable person would observe in the perpetrator's situation. ***See*** 18 Pa.C.S.A. § 302(b)(3).

Here, the Commonwealth presented the expert testimony of Wayne Ross, M.D., who performed the autopsy. Dr. Ross concluded that Finnick suffered serious bodily injury with signs of new and old trauma to the brain and spine indicated by tears in the blood vessels deep in the brain and bruising on the head. ***See*** N.T. Jury Trial, 5/24/21, at 154-60, 166-195. He determined within a reasonable degree of scientific certainty that Finnick died as a result

of these traumatic brain and spinal cord injuries. *See id.* at 196-197. The cause of the injuries was consistent with Finnick's head being rapidly and violently moved as well as nine separate strikes to the head. *See id*. at 156-60, 176, 195.

Another expert witness offered by the Commonwealth, Dr. Lori Frasier, M.D., agreed that the brain trauma that caused Finnick's death was incurred from the child being violently shaken and hitting his head on a hard, blunt object or a hard, blunt object hitting his head. *See id.* at 41-43, 88-89. Additionally, Finnick's mother established that Wagner was with Finnick and responsible for his care at the time the injuries likely occurred and Finnick was found unresponsive. *See id.* at 58-61.

Collectively, viewed in the light most favorable to the Commonwealth, this evidence is sufficient to support a conclusion that Wagner shook Finnick and caused hard blows to his head, resulting in trauma to the brain and spine which led to Finnick's death. Therefore, for the charge of aggravated assault, this evidence is sufficient to find that Wagner acted in a manner that is a gross deviation from the standard of conduct of a reasonable person and indicates a reckless disregard of the substantial and unjustifiable risk of seriously injuring Finnick. *See Nichols*, 682 A.2d 185. Similarly, for the charge of third-degree murder, this evidence is sufficient to find that Wagner acted with a recklessness to the most serious risk of injury and an extreme indifference to the value of human life. *See Fisher*, 80 A.3d 1191. As a result, we conclude

that the evidence is sufficient to support the convictions of aggravated assault and criminal homicide – murder in the third degree.

In his brief, Wagner presents four specific arguments against this conclusion. First, he highlights that the Commonwealth's medical expert, Dr. Ross, could only speculate as to how Finnick suffered the blunt force trauma to his head. **See** Appellant's Brief, at 32. However, this argument does not accurately describe Dr. Ross's testimony. As noted above, Dr. Ross testified that to a reasonable degree of medical certainty, Finnick suffered at least 9 strikes to his head before dying. While this is not direct evidence of the exact circumstances that led to Finnick's death, it certainly is circumstantial evidence that Wagner, as the adult who was responsible for Finnick's care at the time, had violently handled four-month-old Finnick. Since there was no evidence that any other person capable of inflicting such violence interacted with Finnick at the relevant time, the jury could reasonably infer Wagner's violent treatment of Finnick.

Next, Wagner argues that Dr. Ross acknowledged that Finnick had been sick prior to his death. **See id.** He separately maintains that there was evidence that Finnick was suffering from an *E. Coli* infection resulting in sepsis. **See id.** Finally, he asserts that the testimony of his own experts so undercut the Commonwealth's theory of Finnick's death that there was reasonable doubt. **See id.** These arguments, however, are more properly classified as challenges to the weight of the evidence. There was certainly evidence

supporting a conclusion that Finnick died from causes other than those highlighted by Dr. Ross. And some of that evidence came in the form of expert testimony that directly contradicted Dr. Ross's testimony. But Dr. Ross nevertheless explicitly opined that Finnick died from blunt force trauma to his head. The evidence of other possible causes of death raises questions of the credibility of Dr. Ross's opinion, not its sufficiency. Wagner's first issue on appeal merits no relief.

In his second issue, Wagner claims that the guilty verdict was against the weight of the evidence. *See* Appellant's Brief at 34-39. "The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Gonzalez***, 109 A.3d 711, 723 (Pa.Super. 2015) (citation omitted). Appellate review of the weight of the evidence is "extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience." ***Id.*** A verdict may only be reversed if "it is so contrary to the evidence as to shock one's sense of justice." ***Id.***

More specifically, Wagner contends that the manifest weight of the evidence suggests Finnick's cause of death was untreated sepsis from an *E. coli* infection, not the brain trauma as presented by the Commonwealth. ***See*** Appellant's Brief, at 36-38. Wagner relied on the defense expert testimony offered by Michael Laposata, M.D., Ph.D., which suggested that sepsis due to

an *E. Coli* infection, combined with a blood clotting disorder, caused Finnick's death. N.T. Jury Trial, 5/25/21 at 21-22, 24-25, 30. Dr. Laposata testified the blood clotting disorder can mimic trauma and Finnick's injuries were a result of life-saving measures taken by medical professionals. ***See id.*** at 32, 35-36. The defense's other expert witness, Janice Ophoven, M.D., agreed Finnick died of sepsis and the injuries were due to life-saving measures performed. ***See id.*** at 74-76, 101-102.

In rebuttal, Dr. Ross disputed that a blood clotting disorder caused the brain trauma because such a disorder would cause blood all over the brain and inside the brain which was not found here. ***See id.*** 190-195; ***see also*** N.T. Jury Trial, 5/26/21 at 27. He disagreed with the defense's theory that life-saving CPR caused the injuries because, if Finnick had a blood clotting disorder, there would have been bruises on the child's back. ***See id.*** at 31,34. Similarly, Dr. Frasier explained that the trauma from injuries could present symptoms of sepsis, but sepsis could not explain the damage to Finnick's head and neck. ***See*** N.T., 5/24/21 at 86-87.

After reviewing this record, the trial court concluded that

the experts disagreed with one another, and the jury had to and evidently did choose which expert testimony to believe. We did not find [Wagner's] expert testimony so strong that the verdicts may be said to be against the weight of the evidence, and we found the Commonwealth's evidence neither weak nor tenuous. … We note that the defense expert testimony of Dr. Laposata was compelling, but that we found Dr. Ophoven's testimony less than credible. Apparently, the jury thought the same. We were far from shocked at the verdicts.

Trial Court Opinion, 4/11/22, at 10.

After our own independent review of the record, we cannot conclude that the trial court's reasoning constitutes an abuse of discretion. **See id.** The trial court's observation that this was a battle of expert opinion is accurate, as is the court's observation that the jury performed its assigned duty and resolved the conflict based upon credibility assessments. **See Gonzalez**, 109 A.3d 723. Wagner's second issue merits no relief.

Next, Wagner claims Dr. Ross's rebuttal expert testimony strayed beyond the bounds of proper rebuttal testimony. **See** Appellant's Brief, at 39-42. The admissibility of "expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." **Commonwealth v. Huggins**, 68 A.3d 962, 966 (Pa. Super. 2013) (citation omitted). Rebuttal testimony is admissible to discredit the defense's expert witness and, in doing so, may repeat some of the prior testimony given. **See Remy v. Michael D's Carpet Outlets**, 571 A.2d 446, 450 (Pa. Super. 1990).

Here, the Commonwealth called on Dr. Ross to rebut Wagner's expert's claim that his work was "sloppy" and lacking a comprehensive review. N.T., 5/26/21 at 4-8. Additionally, Dr. Ross was called to refute Wagner's experts' assertions that the cause of death was sepsis caused by an *E. coli* infection which was, in part, repetitive to their prior direct examinations but was offered

in direct response to the testimony of Wagner's expert witnesses. The trial court decided that allowing Dr. Ross to directly address the criticisms of his expert opinion would aid the jury in performing its task in assessing the credibility of the conflicting expert opinions. We cannot conclude that this was an abuse of the trial court's discretion. **See Commonwealth v. Yale**, 150 A.3d 979, 983 (Pa. Super. 2016) (concluding there was nothing improper with the trial court's decision to allow an expert to address criticisms of his direct testimony in rebuttal).

In his fourth issue, Wagner claims the trial court erred in allowing an autopsy photo of Finnick's body to be introduced during rebuttal testimony. **See** Appellant's Brief, at 43-48. The trial judge has the discretion of admitting photographs of a murder victim and only an abuse of this discretion would establish reversible error. **See Commonwealth v. Spell**, 28 A.3d 1274, 1279 (Pa. 2011). The court must first determine whether the photograph is inflammatory and, if inflammatory, then "decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." **Commonwealth v. Chester**, 587 A.2d 1367, 1373-74 (Pa. 1991) (citations omitted).

Here, the trial court determined that the photo was not inflammatory, explaining: "It does not depict the child's face or front of his body. Some redness is visible on the back and neck, but not alarmingly so, and no

lacerations, blood, or other offensive visuals are present." Trial Court Opinion, 4/11/22, at 15. In fact, when Wagner's counsel objected to the admission of the photos at trial stating that showing Finnick's face would be "indecent," the court excluded the photo showing his face and only admitted the photo that showed Finnick's back, neck, and lower back of head. N.T. 5/26/21 at 8.

The trial court admitted the photograph because it found the photograph relevant to an issue that was hotly disputed by the experts. **See** Trial Court Opinion, 4/11/22, at 15. Wagner's experts posited that Finnick was suffering from a blood disorder that hindered his ability to form blood clots. **See** N.T., 5/25/21, at 26. Wagner's experts therefore opined that this lack of clotting, when combined with the CPR performed on Finnick, explained the bruising on Finnick's head. **See id.**, at 74. In contrast, Dr. Ross opined that he discounted the blood clotting theory because, if true, there would be bruises on Finnick's back from the CPR. **See** N.T., 5/26/21, at 31-34.

Under these circumstances, we cannot conclude the trial court abused its discretion in admitting the photograph. **See Spell**, 28 A.3d at 1279. The presence or absence of bruising on Finnick's back was directly relevant to the jury's analysis of a material dispute between the experts. **See Chester**, 587 A.2d at 1373-74. Wagner's fourth issue merits no relief.

Next, Wagner claims the trial court erred by allowing and not striking a portion of the Commonwealth's closing argument in which it used Dr. Ophoven's expert report to impugn Dr. Ophoven's credibility. During its

closing argument, the Commonwealth indicated that it intended to publish the

conclusion of Dr. Ophoven's report. *See* N.T., 5/26/21, at 86. After the trial

court overruled defense counsel's request for a sidebar, the Commonwealth

published the report to the jury and highlighted inconsistencies in the report:

> In that paragraph [Dr. Ophoven] says without investigative reports and autopsy photos, it is challenging to come to blah, blah, blah. But when we look [at] the end of her report, she lists materials that she examined. In those materials she indicated a flash drive with autopsy photos, 280 images.
>
> Another heading, Carlisle Borough Police, and subheadings for incident report, initial report, comments. I don't know what she's referring to by comments, but it's under Carlisle Borough Police, a narrative, again, of some sort. I don't know what that is, what she is referring to, but it appears on the materials from Carlisle Borough Police, supplemental reports all under the heading Carlisle Borough Police.
>
> …
>
> So when you are considering Dr. Ophoven's accuracy and trustworthiness in a matter of such magnitude, consider this level of sloppiness. Remember, this is a report she generated [on] December 13 of 2020, months and months ago. It's not as if she just generated this report last week. So keep that in mind when deciding whether or not to follow the trusted Dr. Ophoven on the issue of whether we can make a conclusion regarding one explanation that is homicide over another that is natural death.

*Id.*, at 88-89.

After the jury was excused, the trial court asked defense counsel to state

her objection:

> [Defense counsel:] … Here's the problem. The expert reports, number one, they are largely – I think they can be considered testimonial in nature. Number 2, exhibits are not supposed to go out to the jury that include – that require expertise to understand them, and certainly all of these reports do. And number 3, all of

the reports have within them hearsay, which is properly excluded and which did not come in, in this trial.

THE COURT: I'm not talking about the entirety of the report, because that's not what was shown. Was there any hearsay contained in … the part that was shown to the jury?

[Defense counsel:] No, but the part that was shown to the jury was not put in context with the entire report. The part that was shown to the jury was suggested to be either a copy or paste from Dr. Ophoven's report. Now, Dr. Ophoven was not impeached with that or cross-examined on that point. And now, now that issue has been raised, it seems likely that the jury will have questions about that issue and about the reports in general, and they should not go out and that's why I asked [the prosecutor] before, and I should have brought this up ahead of time, but that's why I asked him, are you planning on showing anything that has not been published. I think it just creates a quagmire.

*Id.*, 109-110. The court then overruled Wagner's objection. *See id.*, at 110.

On appeal, Wagner argues this ruling was in error. His argument alternately frames the issue as either a claim of prosecutorial misconduct, or one of evidentiary error. *See* Appellant's Brief, at 50-51. Because Wagner does not clearly identify the basis of his claim of error, he fails to develop any argument that entitles him to relief. To properly address either version of Wagner's argument, whether it is a claim of evidentiary error or a claim of prosecutorial misconduct, would require this Court to, in effect, act as counsel and develop the argument beyond what Wagner has set forth in his brief. These circumstances require that we find Wagner has waived this issue.

Even if not waived, we note that under both versions of Wagner's argument, Wagner is not due relief unless the claimed error caused more than *de minimis* prejudice. *See Commonwealth v. Hairston*, 84 A.3d 657, 671-

- 13 -

672 (Pa. 2014) (evaluating claim of improper admission of evidence for harmless error); **Commonwealth v. Brown**, 134 A.3d 1097, 1106-1107 (Pa. Super. 2016) ("Prosecutorial misconduct is evaluated under a harmless error standard." (citation omitted)).

> The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. … Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilty was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Hairston**, 84 A.3d ay 671-672.

Here, Wagner concedes the evidence was used for the purpose of impeaching Dr. Ophoven's credibility. **See** Appellant's Brief, at 52. We cannot conclude that the publication of portions of Dr. Ophoven's expert report for the first time during closing arguments necessarily caused more than *de minimis* prejudice to Wagner. As the trial court noted, this trial boiled down to a dispute among experts. Both sides vigorously impeached the credibility of the opposing experts. For example, Dr. Ophoven opined that retinal slides provided by Dr. Ross showed tissue that was "in little pieces which is not ideal for making a determination." N.T., 5/25/21, at 82. As a result, she declared the slides "not at all diagnostic." **Id.**, at 83. Further, Dr. Ophoven opined that Dr. Ross had not performed a proper analysis of Finnick's spine. **See id.**, at

88. When asked about Dr. Ross's opinion that Finnick was suffering from a viral infection as opposed to an *E. Coli* infection, Dr. Ophoven disagreed and quipped, "I'd like his crystal ball." *Id.*, at 96.

Defense counsel argued that Dr. Ross's "suspicion [was] grounded in only a partial knowledge of the facts and an inflexibility and hubris…". N.T., 5/26/21, at 69. Counsel highlighted that Dr. Ross informed the police that this was a homicide case only one hour after he began his autopsy of Finnick. ***See id.***, at 72. Counsel argued that Dr. Ross was biased due to his desire to defend his methodology and professionalism. ***See id.***, at 74.

In rebuttal, Dr. Ross labeled Dr. Ophoven's criticism of the retinal slides as "invalid and unscientific." N.T., 5/26/21, at 21. In fact, Dr. Ross repeatedly referred to Dr. Ophoven's critiques as invalid, unscientific, or haphazard. ***See id.***, at 21-22; 38; 39. Further, the Commonwealth argued, without objection, that Dr. Ophoven was "a non-neuro pathologist who hasn't done an autopsy since 2009, hasn't seen a child patient since sometime in the '70s, …. Hasn't seen a child patient, she disagrees [with Dr. Ross,] she knows better." *Id.*, at 93.

The jury was tasked with choosing between experts who vehemently disagreed with the substance of the other's expert testimony. And both experts explicitly attacked the methodology and professionalism of the opposing expert. Defense counsel and the prosecutor both extensively cross-examined each expert to contrast their methodologies and expert opinions.

Under these specific circumstances we cannot conclude that the prosecutor's action in publishing and highlighting a portion of Dr. Ophoven's report to focus on what may have been a typographical error prejudiced Wagner in any meaningful way. Accordingly, Wagner's fifth issue on appeal merits no relief.

Lastly, Wagner argues the court abused discretion by sentencing him to an aggregate term of twenty to forty years in a state correctional facility. *See* Appellant's Brief, at 53-60. Wagner challenges the discretionary aspects of his sentence. "Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (citation omitted). Before we can reach the merits of Wagner's claim, we must perform a four-part analysis:

> (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation and brackets omitted).

Here, Wagner filed a timely appeal and preserved his claim in his post-sentence motion. Wagner also included a separate Rule 2119(f) Statement in his brief; accordingly, we will review his Rule 2119(f) statement to determine whether he has raised a substantial question. *See Commonwealth v. Provenzano*, 50 A.3d 148, 154 (Pa. Super. 2012) (stating that "we cannot look beyond the statement of questions presented and the prefatory 2119(f)

statement to determine whether a substantial question exists." (citation omitted)).

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." **Commonwealth v. Edwards**, 71 A.3d 323, 330 (Pa. Super. 2013). "A substantial question [exists] only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Id.** (citation omitted).

In his Rule 2119(f) statement, Wagner implies that the trial court imposed an aggravated range sentence. **See** Appellant's Brief, at 23 ("The reasons to aggravate Mr. Wagner's sentence are inadequate …"). However, we agree with the trial court that Wagner's sentence was within the guidelines. Wagner correctly notes that the lowest possible minimum sentence pursuant to the guidelines is seven years given Wagner's prior record score of one. **See** 204 Pa. Code § 303.16(a). However, as Wagner concedes, the trial court properly considered the minimum sentence to be at least 15 years pursuant to the Commonwealth's invocation of 42 Pa.C.S.A. § 9718(a)(2). **See** Appellant's Brief, at 53.

Furthermore, the highest possible minimum standard range sentence under the guidelines was one-half the statutory maximum sentence for third-degree murder. **See** 204 Pa. Code § 303.16(a). The statutory maximum

sentence for third-degree murder is 40 years. **See** 18 Pa.C.S.A. § 1102(d). As a result, Wagner's 20-year minimum sentence falls within the standard range of the guidelines. Since Wagner's argument is premised on an incorrect reading of the sentencing guidelines, he has not presented a substantial question and we cannot review the argument on the merits. **See Commonwealth v. Fowler**, 893 A.2d 758, 767 (Pa. Super. 2006) (observing that "the standard range … is presumptively where a defendant should be sentenced.").

As we conclude none of Wagner's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/17/2023